Opinion issued July 1,
2010



In The

Court of Appeals

For The

First District of Texas

————————————

NO. 01-08-00830-CV

———————————

Mariner Health Care of Nashville, Inc. d/b/a Mariner Health of
Southwest Houston,
Appellant

V.

Gladys
Robins, Individually and on behalf of the Estate of Betty Battle, Deceased, Appellee



 



 

On Appeal from the 61st District Court

Harris County, Texas



Trial Court Case No. 2006-51469

 



 

O P I N I O N

          Appellee Gladys Robins sued appellant Mariner Health Care of Nashville,
Inc.  Robins asserted claims for medical malpractice under the Texas Wrongful Death
Act and the Texas Survival Statute, alleging that her mother, Betty Battle,
suffered injuries and died due to negligent nursing home care.  See Tex. Civ. Prac. & Rem. Code Ann. §§
71.001–.012 (Vernon 2008) (wrongful death action); id. § 71.021 (survival
action).

A jury found in favor of Robins only on the survival action,
and the jury awarded her $750,000, which the trial court reduced to $250,000.  See
Tex. Civ. Prac. & Rem. Code Ann.
§ 74.301(b) (Vernon 2005) (capping noneconomic damages at $250,000).  Although
other wrongful death beneficiaries were plaintiffs at trial, Robins is the sole appellee in this
appeal, which pertains only to the survival action.

Mariner brings four issues on appeal: (1) Robins lacks
standing or capacity to pursue claims on behalf of Battle’s estate, and therefore
the claims are barred by the statute of limitations; (2) the trial court abused
its discretion by sustaining two challenges to peremptory strikes; (3) the
evidence was legally and factually insufficient to support the jury’s findings
on negligence, proximate cause, and damages; and (4) the trial court improperly
submitted to the jury a broad form question pertaining to damages.

          We
affirm.

BACKGROUND

          Betty
Battle lived in southwest Houston with her adult sons Robert Charles Robin and
Dexter Leon Battle.  In addition, her adult daughters Gladys Robins, Sandra
Jean McGowan, and Lucille Marie Brown lived nearby and visited frequently.  Battle
smoked approximately one to one-and-one-half packs of cigarettes daily.

          In
March 2004, Battle fell while grocery shopping and broke her hip.  After
undergoing hip replacement surgery at St. Luke’s Hospital, she went to Mariner
for rehabilitation.  Her primary physician was Dr. Khoa Nguyen, who was
not a Mariner employee.  Dr. Nguyen testified that when Battle was admitted she
did not have any pressure ulcers (also known as bedsores), but the medical
records from St. Luke’s indicated that she had an excoriation, or the beginning
of a pressure ulcer, on her buttocks when she was transferred to Mariner.  Dr.
Nguyen testified that when Battle entered Mariner, she was confused but in a
good mood and presented with poor nutrition and some kidney disease.  While at
Mariner, Battle developed anemia and stage-3 and stage-4 pressure ulcers, which
were worsening.  A
“stage-3” pressure ulcer exists when “full thickness of skin is lost, exposing
the subcutaneous tissues—presents as deep crater with or without undermining
adjacent tissue.”  A pressure ulcer is classified as “stage 4” when “full
thickness of skin and subcutaneous tissue is lost, exposing muscle or bone.”

Dr. Nguyen sent Battle to Park Plaza Hospital for a blood
transfusion, and from there Battle went to Select Specialty Hospital to receive
care for her pressure ulcers.  She returned to Mariner, still suffering from stage-4
pressure ulcers.  According to Dr. Nguyen these were, in part, the same
pressure ulcers she developed during her first stay at Mariner.

Battle died on August 18, 2008 at the age of sixty-six.  Dr.
Nguyen listed cardiopulmonary arrest as the cause of death on Battle’s death
certificate, but he testified that it was not possible to determine the cause
of death with certainty because no autopsy was performed.

          At
trial, the medical testimony centered on the pressure ulcers and the multiple
other medical conditions from which Battle suffered and their effect on the
healing or exacerbation of the wounds.  Testimony showed that Battle suffered
from hypertension, diabetes, kidney problems, dehydration, malnutrition,
possible dementia, and heart problems.  Some, but not all, of these conditions
were known to Battle’s children before her admission to Mariner.

          In
addition, conflicting testimony was presented about Battle’s cooperation with
her caregivers.  For example, Dr. Nguyen testified that he had no specific
memory of Battle’s noncompliance, but there were notes in the medical records
that she refused to be cleaned after incidents of incontinence, refused to be
repositioned or insisted on staying in the same position for lengthy periods of
time, refused to eat, declined to participate in physical therapy, and
continued to smoke even after being told that it would hamper her healing. 
Robins explained that her mother’s refusal to be repositioned was related to
pain and that her mother did not like the food she was served.

          Robins
and her siblings sued Mariner for medical malpractice under the wrongful death act
and survival statute.  Although the pleadings stated that Robins sued “on
behalf of” her mother’s estate, no probate proceedings were ever initiated. 
Mariner, however, did not file a verified pleading—or any pleading—contesting
Robins’s capacity to sue.

          At
trial, Mariner’s counsel used four peremptory strikes to exclude four of six prospective
African-American jurors.  Robins’s counsel asked the trial court to examine the
strikes of those four veniremembers, alleging that Mariner’s strikes were
racially motivated.  The trial court overruled the challenge as to two prospective
jurors who had made statements suggesting they held biases related to the facts
of the case, sustained the challenge as to the other two prospective jurors,
and seated one of the challenged veniremembers on the jury.

          Both
Robins and Mariner presented expert testimony regarding Mariner’s actions and
the applicable standards of care.  The evidence centered not only on Battle’s
pressure ulcers, but also on missing paperwork: no care plan appeared in
Mariner’s records for Battle’s second admission.  

          The
jury found in Mariner’s favor on the wrongful-death claim and awarded $750,000 to
Robins on the survival action.  The trial court reduced the award to $250,000
in accordance with the statutory cap on damages.  Mariner appealed.

STANDING, CAPACITY, AND LIMITATIONS

In its first issue, Mariner contends that it is entitled to
judgment as a matter of law because Robins never pleaded or proved that she has
standing or capacity to assert Battle’s survival claims.  Mariner argues that although
Robins filed suit within two years after Battle’s death, her failure to demonstrate
standing or capacity in the trial court means that the claims are now time
barred.  In response, Robins argues that Mariner has confused the issues of
standing and capacity.  She contends that her trial testimony established her
standing to sue on behalf of her mother’s estate and that Mariner has waived
any complaint as to her capacity to sue.

I.              
Standard
of Review and Applicable Law

A.  
Standing
and Capacity

A plaintiff must have both standing and capacity to bring a
lawsuit.  Austin Nursing Ctr., Inc. v. Lovato, 171 S.W.3d 845, 848 (Tex.
2005).  “Standing is a necessary component of a court’s subject matter jurisdiction.”
 Alpert v. Riley, 274 S.W.3d 277, 291 (Tex. App.—Houston [1st Dist.]
2008, pet. denied) (citing Tex. Ass’n of Bus. v. Tex. Air Control Bd.,
852 S.W.2d 440, 444–45 (Tex. 1993)).  “The issue of standing focuses on whether
a party has a sufficient relationship with the lawsuit so as to have a ‘justiciable
interest’ in its outcome, whereas the issue of capacity ‘is conceived of as a
procedural issue dealing with the personal qualifications of a party to
litigate.’”  Lovato, 171 S.W.3d at 848 (citing 6A Charles Alan Wright et al., Federal Practice
and Procedure § 1559, at 441 (2d ed. 1990)).  Separate from the issue of
a party’s standing, a party’s capacity implicates its legal authority to file a
lawsuit and pursue a particular cause of action.  Lovato, 171 S.W.3d at
847–48.  “A plaintiff has standing when it is personally aggrieved,
regardless of whether it is acting with legal authority; a party has capacity
when it has the legal authority to act, regardless of whether it has a
justiciable interest in the controversy.”  Nootsie, Ltd. v. Williamson County
Appraisal Dist., 925 S.W.2d 659, 661 (Tex. 1996) (emphasis in original).  

To demonstrate standing, a plaintiff must affirmatively show,
through pleadings and other evidence pertinent to the jurisdictional inquiry, a
distinct interest in the asserted conflict, such that the defendant’s actions
have caused the plaintiff some particular injury.  Alpert, 274 S.W.3d at
291 (citing Hunt v. Bass, 664 S.W.2d 323, 324 (Tex. 1984)).  If a
party lacks standing, a trial court lacks subject-matter jurisdiction to hear
the case.  Lovato, 171 S.W.3d at 849.  Thus, standing cannot be waived
and can be raised for the first time on appeal.  Id.  Because a court’s
subject-matter jurisdiction is a question of law, Tex. Dep’t of Parks &
Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004), whether a plaintiff
has standing is a legal question we determine de novo.  Alpert, 274
S.W.3d at 291; see Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 928 (Tex.
1998).

An alleged defect in capacity must be raised by a verified
denial in the trial court.  Lovato, 171 S.W.3d at 849.  The failure to
raise the issue of capacity through a verified plea results in waiver of that
issue both at trial and on appeal.  Tex.
R. Civ. P. 93; see Pledger v. Schoellkopf, 762 S.W.2d 145, 145–46
(Tex. 1988) (“When capacity is contested, Rule 93(2) requires that a verified
plea be filed anytime the record does not affirmatively demonstrate the
plaintiff’s or defendant’s right to bring suit or be sued in whatever capacity
he is suing.” (emphasis in original)); Intracare Hosp. N. v. Campbell, 222
S.W.3d 790, 793 n.2 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (“The Texas
Rules of Civil Procedure require that a defendant challenging a plaintiff’s
capacity to sue raise the matter by verified pleading, if lack of capacity is
not evident from the petition.”).  The burden is on the defendant to challenge a
plaintiff’s capacity to sue.  Lovato, 171 S.W.3d at 853 n.7; Intracare
Hosp. N., 222 S.W.3d at 793 n.2.  

B.   Survival Act Claim

When a pers on dies, all of the decedent’s real and personal
property become part of an estate, including any actual or potential cause of
action.  Tex. Prob. Code Ann. §
3(l), (z) (Vernon Supp. 2009); Lovato, 171 S.W.3d at 850 &
n.2.  When a person dies without a will, title to the decedent’s property vests
immediately in his heirs, subject to the payment of debts.  Tex. Prob. Code Ann. § 37 (Vernon
2003).  Thus, a personal injury action survives the death of an injured person to
and in favor of the heirs, legal representatives, and estate.  Tex. Civ. Prac. & Rem. Code Ann. § 71.021
(Vernon 2008); Lovato, 171 S.W.3d at 849 (noting that statute abrogated
common-law rule that personal injury claims do not survive death of injured
person).

In Lovato, the plaintiff’s mother died intestate after
suffering from pressure ulcers she developed while a resident at Austin Nursing
Center.  Lovato, 171 S.W.3d at 846-47.  Lovato filed suit on behalf of
her mother’s estate, purportedly as its personal representative, but at the
time suit was initially filed Lovato had not filed an application for
independent administration of the estate.  Id. at 847.  After
limitations ran, the probate court appointed Lovato independent administrator
of the estate, and Lovato amended the petition in her survival action.  Id. 
The trial court granted summary judgment in favor of Austin Nursing Center
based on limitations because a person with standing did not timely assert the
survival action.  Id.  The court of appeals reversed, reasoning that
Lovato’s post-limitations amended petition related back to the time of the
original filing and cured her “defective standing.”  Id.

The Texas Supreme Court wrote at length to clarify the
difference between standing and capacity.  Id. at 848–54.  In a
footnote, the Court distinguished its own precedents and other opinions from
the courts of appeals that confused standing with capacity, id. at 851
n.3, concluding that “in a survival action, the decedent’s estate has a
justiciable interest in the controversy sufficient to confer standing.”  Id.
at 850.

II.           
Analysis

          Robins asserted a survival claim in both
her individual capacity as an heir and as a purported representative of Betty Battle’s
estate seeking recovery for both wrongful-death and survival-act claims.  The
survival action alleged that before her death, Battle suffered from pressure
ulcers that she developed while a resident at Mariner.  Immediately prior to
her death, Battle was personally aggrieved by Mariner, and her potential cause
of action against Mariner became part of her estate at the moment of her death.
 See Tex. Prob. Code Ann.
§ 3(l), (z) (Vernon Supp. 2009).  Under Lovato, Battle’s estate has
a justiciable interest in this controversy sufficient to confer standing.  Lovato,
171 S.W.3d at 850. 

However, Mariner also challenges Robins’s capacity to bring
the suit.  The survival statute provides that a personal representative,
administrator, or heir may sue on behalf of an estate.  Tex. Civ. Prac. & Rem. Code Ann. § 71.021(b) (Vernon
2008).  “[G]enerally, personal representatives of the decedent’s estate are the
only people entitled to sue to recover estate property.”  Shepherd v.
Ledford, 962 S.W.2d 28, 31 (Tex. 1998); but see Lovato, 171 S.W.3d
at 850 (distinguishing between standing and capacity).  However, “[h]eirs at
law can maintain a survival suit during the four-year period the law allows for
instituting administration proceedings if they allege and prove that there is
no administration pending and none necessary.”  Shepherd, 962 S.W.2d at
31–32.

Mariner argues that Robins did not plead and prove that
administration of Battle’s estate was unnecessary.  See generally Tex. Prob. Code Ann. §§ 178 et seq. (Vernon
Supp. 2009) (governing appointment of administrators).  Mariner thus contends
that Robins’s failure to initiate an administration should be fatal to the
survival claim.  Contrary to Mariner’s assertion, Robins testified at trial
that no administration of her mother’s estate was necessary.  Robins testified
that all of Battle’s heirs were plaintiffs in this lawsuit, that she had been
designated by the heirs to act on their behalf, that Battle died intestate,
that all of Battle’s debts had been paid and all of her assets had been equally
divided among her heirs, that probate proceedings were not initiated, and that
there was no need for an administration.  See id. § 178(b)
(administration of estate is necessary only “if two or more debts exist against
the estate, or if or when it is desired to have the county court partition the
estate among the distributees, or if the administration is necessary to receive
or recover funds or other property due the estate”).

          Nevertheless,
we need not resolve this issue on the merits because Mariner has waived it. 
Mariner did not file a verified pleading contesting Robins’s capacity to bring
this survival action as required by Rule of Civil Procedure 93.  Tex. R. Civ. P. 93; see Pledger,
762 S.W.2d at 145–46.  Rather than asserting this issue at a time when
the trial court could have abated the case to permit Robins to initiate probate
proceedings, Mariner chose to wait until the close of evidence to first raise
this issue in the trial court and by urging it on appeal in support of its
argument that Robins’s claims are now time barred.  We hold that Battle’s
estate had standing to sue and that Mariner waived its challenge to Robins’s
capacity to represent Battle’s estate.  We overrule Mariner’s first issue.

CHALLENGE to
peremptory strikes

          In
its second issue, Mariner challenges the trial court’s action sustaining Robins’s
challenge as to two of Mariner’s peremptory strikes.

I.              
Standard
of Review

In Batson v. Kentucky,
the United States Supreme Court declared that racially motivated use of
peremptory challenges in criminal cases violates due process of law and
requires reversal.  476 U.S. 79, 106 S. Ct. 1712 (1986).  In Edmonson v.
Leesville Concrete Co., the Court applied Batson’s reasoning to
civil trials.  500 U.S. 614, 618-28, 111 S. Ct. 2077, 2081–87 (1991); see
Goode v. Shoukfeh, 943 S.W.2d 441, 444–45 (Tex. 1997).

We review a trial court’s ruling on a Batson challenge
for abuse of discretion.  Goode, 943 S.W.2d at 446; Jack v. Holiday
World, 262 S.W.3d 42, 48 (Tex. App.—Houston [1st Dist.] 2008, no pet.); Baker
v. Sensitive Care-Lexington Place Health Care, Inc., 981 S.W.2d 753, 757
(Tex. App.—Houston [1st Dist.] 1998, no pet.).  A trial court abuses its
discretion if its decision is arbitrary, unreasonable, and without reference to
guiding principles.  Goode, 943 S.W.2d at 446.

Resolution of a Batson challenge is a three-step
process: (1) the party challenging the strike must establish a prima facie case
of racial discrimination; (2) if the party challenging the strike does so,
the striking party must come forward with a race-neutral explanation; and (3)
if the striking party does so, the party challenging the strike must prove
purposeful racial discrimination.  Miller-El v. Dretke, 545 U.S. 231,
239, 125 S. Ct. 2317, 2324–25 (2005); Goode, 943 S.W.2d at 445–46.  

II.           
Voir Dire

          During
voir dire, both attorneys brought up the issue of missing paperwork or missing
medical records, which was a central issue in the case.  One prospective juror,
who was African-American, stated that he would be biased against Mariner due to
missing paperwork, although he later stated that he could be fair.  Both
attorneys also addressed the issue of bedsores to determine if panel members
had any personal or familial experience on that subject.  Another African-American
veniremember stated that her mother had developed pressure sores and that they
healed.

III.        
Challenge
to Mariner’s Peremptory Strikes

          After
both sides exercised their peremptory strikes, Robins’s counsel alleged that
Mariner’s strikes of four of the six African-American veniremembers were
racially motivated.  The trial court overruled Robins’s challenge as to two prospective
jurors: the one who stated that her mother had suffered from pressure ulcers
that had healed and the one who stated that he had an issue with missing
medical records.  However, the trial court sustained Robins’s challenges as to
Collins, who was seated on the jury, and Williams, who was a potential
alternate juror and who did not serve in any capacity. 

A.   Williams

Because Williams was not seated as a juror or an alternate
juror, the trial court’s action in sustaining Robins’s Batson challenge
as to him did not affect the composition of the jury.  Therefore, it could not
have caused the rendition of an improper judgment or prevented Mariner from
presenting its case on appeal.  Even if the trial court abused its discretion
in sustaining this challenge—a matter upon which we offer no opinion—any error
would be harmless as a matter of law.  See Tex. R. App. P. 44.1(a).  Therefore, we will focus our
analysis on the propriety of the trial court’s action regarding Collins.

B.   Collins

Collins did not speak at all during voir dire.  After Robins’s
counsel made a prima facie case that Mariner’s strikes were racially motivated,
Mariner offered its race-neutral explanation for striking Collins.  See Miller-El,
545 U.S. at 239, 125 S. Ct. at 2324.  Mariner’s counsel stated that he had
excluded Collins because of her occupation and nonverbal conduct.  Mariner’s
counsel stated that he believed that she would “be a stickler for paperwork”
because she was a public school teacher.  In addition, Mariner’s counsel
stated, “[D]uring the plaintiffs’ voir dire, [she] was basically making good
eye contact with plaintiffs’ counsel.  My sense is: She found him to be
charming and amusing.  I felt like—I disagree with that.  I had poor eye
contact with her.”

At that point, the trial court had to determine if Robins had
proven purposeful discrimination and if it believed Mariner’s proffered
explanation.  Baker, 981 S.W.2d at 756.  None of Collins’s
nonverbal conduct appears on the record, except as described by Mariner’s
counsel.  Collins did not respond to the questions about paperwork, and
Mariner’s counsel did not specifically question her about that issue.  See
Whitsey v. State, 796 S.W.2d 707, 713–14 (Tex. Crim. App. 1989); Lott
v. City of Fort Worth, 840 S.W.2d 146, 151 (Tex. App.—Fort Worth 1992, no
writ).  Based upon our review of the record, we have no reason to conclude that
the trial court exceeded its discretion to disbelieve Mariner’s explanation for
its strikes as pretextual.  See Davis v. Fisk Elec. Co., 268
S.W.3d 508, 518-19 (Tex. 2008).  

Moreover, even if the trial court had erred in sustaining the
Batson challenge, we
may not reverse a judgment unless we conclude that the trial court’s error
“probably caused the rendition of an improper judgment” or “probably prevented
the appellant from properly presenting the case to the court of appeals.”  Tex. R. App. P. 44.1(a).  Here, the
verdict form shows that Collins did not vote in favor of the verdict on the
controlling questions of liability, comparative fault, and damages, upon which
the trial court based its judgment.  Because Collins apparently sided with
Mariner—or believed that Robins did not prove her case—Mariner cannot show that
any error of the trial court affected the judgment.  Thus, we conclude that the
error, if any, was harmless.  See id.

We hold that Mariner has not shown that the trial court abused
its discretion in sustaining Robins’s challenge to Ms. Collins.  We overrule
Mariner’s second issue.

LEGAL AND FACTUAL SUFFICIENCY

          In
its third issue, Mariner contends that the evidence was legally and factually
insufficient to support the jury’s findings that Mariner was negligent, that
Mariner’s negligence proximately caused Battle’s injuries, and that Battle suffered
physical pain and mental anguish compensable by the damages award of $250,000. 
The jury awarded
$750,000 in damages, but the trial court reduced this to $250,000 in its
judgment.  See Tex. Civ. Prac.
& Rem. Code Ann. § 74.301(b) (Vernon 2005) (capping
non-economic damages in suits against health care institutions).

I.              
Standard
of Review

In a legal sufficiency, or “no-evidence” review, we determine
whether the evidence would enable reasonable and fair-minded people to reach
the verdict under review.  City of Keller v. Wilson, 168 S.W.3d 802, 827
(Tex. 2005).  In making this determination, we credit favorable evidence if a
reasonable fact-finder could, and we disregard contrary evidence unless a
reasonable fact-finder could not.  Id.  We consider the evidence in the
light most favorable to the finding under review and indulge every reasonable
inference that would support it.  Id. at 822.  So long as the evidence
falls within the zone of reasonable disagreement, we may not substitute our
judgment for that of the fact-finder.  Id. at 822.  The trier of fact is
the sole judge of the credibility of the witnesses and the weight to give their
testimony.  Id. at 819.  Although we consider the evidence in the light
most favorable to the challenged findings, indulging every reasonable inference
that supports them, we may not disregard evidence that allows only one
inference.  Id. at 822.

In reviewing a challenge to the factual sufficiency of the
evidence, we must consider and weigh all the evidence and should set aside the
judgment only if it is so contrary to the overwhelming weight of the evidence
as to be clearly wrong and unjust.  Ortiz v. Jones, 917 S.W.2d 770, 772
(Tex. 1996) (citing Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)); Arias
v. Brookstone, L.P., 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.]
2007, pet. denied).

The jury is the sole judge of witnesses’ credibility; it may
choose to believe one witness over another, and a reviewing court cannot impose
its own opinion to the contrary.  Wilson, 168 S.W.3d at 819; Arias,
265 S.W.3d at 468.  Because it is the jury’s province to resolve conflicting
evidence, we must assume that the jury resolved all conflicts in accordance
with its verdict if reasonable human beings could do so.  Wilson, 168
S.W.3d at 819; Arias, 265 S.W.3d at 468.

II.           
Negligence
and Proximate Cause

In a medical malpractice case, the plaintiff is required to
show evidence of a reasonable medical probability that the injury was
proximately caused by the defendant’s negligence.  Park Place Hosp. v.
Estate of Milo, 909 S.W.2d 508, 511 (Tex. 1995); Duff v. Yelin, 751
S.W.2d 175, 176 (Tex. 1988).  The plaintiff must prove: (1) a duty on the part
of the defendant to act according to applicable standards of care; (2) a breach
of the applicable standard of care; (3) an injury; and (4) a causal connection
between the breach of the standard of care and the injury.  Ocomen v. Rubio,
24 S.W.3d 461, 466 (Tex. App.—Houston [1st Dist.] 2000, no pet.).  

The causation element of a negligence claim comprises the two
following components: the cause in fact, or “substantial factor,” component and
the foreseeability component.  IHS Cedars Treatment Ctr. v. Mason, 143
S.W.3d 794, 798 (Tex. 2003); Leitch v. Hornsby, 935 S.W.2d 114, 118–19
(Tex. 1996); Travis v. City of Mesquite, 830 S.W.2d 94, 98 (Tex. 1992).  Foreseeability
requires that a person of ordinary intelligence would have anticipated the
danger caused by the negligent act or omission.  Doe v. Boys Clubs, 907
S.W.2d 472, 478 (Tex. 1995).  Because both elements are required, a party who
establishes only that an injury was foreseeable cannot prevail.  Grider v.
Mike O’Brien, P.C., 260 S.W.3d 49, 57 (Tex. App.—Houston [1st Dist.] 2008,
pet. denied).  

“In a medical malpractice case, breach of the standard of
care and proximate cause must be established through expert testimony.”  Ocomen,
24 S.W.3d at 466.  Opinion testimony that amounts to “mere conjecture, guess,
or speculation” is not sufficient.  IHS Cedars Treatment Ctr., 143
S.W.3d at 798–99; Price
v. Divita, 224
S.W.3d 331, 337 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).  Expert
opinion testimony that is conclusory or speculative does not tend to make the
existence of a material fact “‘more probable or less probable,’” and it is
neither relevant nor competent.  Coastal Transp. Co. v. Crown Cent.
Petroleum Corp., 136 S.W.3d 227, 232 (Tex. 2004) (quoting Tex. R. Evid. 401).  Evidence that
shows only that the defendant’s alleged negligence did no more than furnish a
condition that made the alleged injuries possible will not suffice to establish
the substantial-factor, or cause-in-fact, component of proximate cause.  See
IHS Cedars Treatment Ctr., 143 S.W.3d at 799.

A.   Mariner’s Contentions

Mariner contends that the evidence was legally and factually
insufficient to support the jury’s finding that Mariner was negligent and that
its negligence proximately caused Battle’s injuries because (1) Dr. Lipson did
not identify any specific employee who provided improper care, (2) Dr. Lipson
was not qualified to testify, and (3) Dr. Lipson did not testify specifically
how Mariner’s alleged deficiencies caused Battle to develop pressure ulcers. 
We will address each of these contentions.

a.   
Identification
of Mariner Employees

          First,
Mariner argues that Dr. Lipson’s testimony was insufficient because he did not
identify any specific Mariner employee who provided improper care.  Mariner relies
on cases in which pretrial expert reports were deemed inadequate because they
did not specify a specific standard of care for each of multiple defendants.  E.g.,
CHCA Mainland, L.P. v. Burkhalter, 227 S.W.3d 221, 227 (Tex.
App.—Houston [1st Dist.] 2007, no pet.); Gray v. CHCA Bayshore, L.P.,
189 S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.); Doades v.
Syed, 94 S.W.3d 664, 671–72 (Tex. App.—San Antonio 2002, no pet.); Rittmer
v. Garza, 65 S.W.3d 718, 723 (Tex. App.—Houston [14th Dist.] 2001, no
pet.).  For example, in Gray, this Court held that an expert report was
inadequate because it identified only one standard of care with respect to two
separate defendants: a hospital and a doctor.  Gray, 189 S.W.3d at 859. 
However, the Texas Supreme Court has held that when a party’s alleged health
care liability is purely vicarious, a pretrial report that adequately
implicates the actions of that party’s agents or employees is sufficient.  Gardner
v. U.S. Imaging, Inc., 274 S.W.3d 669, 671 (Tex. 2008) (per curiam).  In Gardner,
the plaintiff sued both the doctor and the owner and operator of the facility
where the procedure was performed.  Id. at 670.  The pretrial expert
report implicated only the doctor, but the plaintiffs argued that the
facility’s liability was purely vicarious, and the Texas Supreme Court
concluded that the report was sufficient.  Id. at 671.

          In
this case, Robins sued only one defendant: Mariner, a nursing home, which is a
health care provider under the Civil Practice and Remedies Code.  Here, Robins’s
theory of the case was that, although Mariner acted through its employees, it
owed—and breached—certain duties to Battle that a nursing home owes its patient. 
Dr. Lipson testified specifically about the responsibilities and standards of
care for a nursing home or “skilled nursing facility,” as required by the Code
of Federal Regulations.  Lipson testified:

They’re required to provide for nursing care,
rehabilitation care, pharmacy and dietary care, physician care.  They’re
required to make assessments that are comprehensive, as well as renewed
assessments.  They’re required to set up a plan of care, which is
individualized and quantitative, for her.  They’re required to notify the
family and the physician/care provider for changes in condition.  They’re
required to follow what’s called the “rights of the resident” for dignity and
other things.  And they’re required to have a facility that is home-like, that
has a safe environment, and that basically treats people with respect—as I mentioned—and that
there’s good quality of life in the facility, and that various health areas are
treated adequately and completely.

 

          Based
on his experience, training, and his review of the requirements in the Code of
Federal Regulations, Dr. Lipson also testified about the actions a skilled
nursing facility like Mariner should take in caring for a patient, such as:

To provide for adequate nutrition and hydration; to
provide a safe environment and prevent injury; to prevent skin breakdown and
pressure ulcer formation; to monitor for safety and appropriateness of
medications; to provide adequate medical care and oversight; to prevent
recurrent or occurring infections; to prevent falls; to prevent aspiration; to
prevent loss of mobility and contracture formation—basically to
have a plan of care that is followed that will allow for the highest
practicable level of physical, mental, and psychosocial function; to follow
physician orders for the care, unless the physician is questioned by the people
who are carrying out the orders—in this case, the nursing staff—and then that
has to be resolved; to provide complete and accurate assessments of the health
problems and disabilities, which are updated; provide adequate and complete
document changes in—document changes in condition, health status, when
appropriate—intake and output, vital signs, dispensing of
medications and provision of treatment—to notify the charge nurse or supervisor nurse, the
physican and family about changes in conditions and health status; to assess
for pain and prevent it and treat it; to monitor for changes in mental status
and behavior, notify physician and family of changes; and monitor use of
psychotropic medications for altered behavior and/or mental status, and side
effects.

 

Robins’s
theory of recovery was not simply that Mariner was responsible for the
negligence of its employees, who may have breached the standards of care for their
particular professions or specialties, but that Mariner itself was negligent in
carrying out its duties as a health care provider.  Thus, we conclude that in
order to support his opinion testimony Dr. Lipson was not required to identify
specific Mariner employees who behaved negligently.

b.   
Qualifications
to testify about standards of care

          Second,
Mariner contends that Dr. Lipson was not qualified to testify because he did
not establish any nursing qualifications and because his medical degree did not
qualify him to render an opinion on nursing.  Mariner did not challenge Dr.
Lipson’s qualifications before or during trial.  Therefore, Dr. Lipson’s
qualifications were a matter for the jury to consider in determining the weight
to give his testimony.  Cf. Maritime Overseas Corp. v. Ellis, 971
S.W.2d 402, 409-10 (Tex. 1998).  

Dr. Lipson testified that he had been a physician,
researcher, and consultant for nearly 40 years.  He testified that he graduated
from Johns Hopkins Medical School and completed fellowships at the National
Institutes of Health, Massachusetts General Hospital, Harvard Medical School,
Beth Israel Hospital, and Brigham and Women’s Hospital (in geriatric
medicine).  In addition, he worked at Harvard’s skilled nursing facility and
became a fellow to the Institute for Advanced Studies on Gerontology at the
Ethel Percy Andrus Gerontology Center at the University of Southern California
(USC).  He served as medical faculty at several medical schools, teaching and
lecturing in the fields of geriatric care, and he studied medication and its
side effects on senior citizens at the Geriatric Research Institute.  He also
testified that, for 13 years, he provided quality assurance and oversight for
six state-run nursing homes in Alaska, he worked as a primary caregiver in
skilled nursing facilities, he set up two teaching nursing homes under the
auspices of USC, and he worked as a consultant in the areas of nursing-home
care and senior care for the California Department of Justice, the New Mexico
Attorney General, and United States Departments of Justice and Health and Human
Services, reviewing over 6,000 patient charts and visiting more than 450
nursing homes. 

We conclude that a reasonable jury could have credited Dr.
Lipson’s testimony as that of an expert on nursing homes and geriatric care.

c.    
Expert
testimony should not be conjecture

          Third,
Mariner alleges that Dr. Lipson did not describe how Mariner’s alleged
deficiencies in care specifically injured Battle.  Mariner also contends that Dr.
Lipson’s testimony was no more than testimony about “mere possibilities” and
suggests that Battle’s injuries would have occurred regardless of Mariner’s
acts or omissions.  In
its brief, Mariner argued, “Since the jury could only speculate as to whether
Battle would have developed these decubitus ulcers, one which developed before
her arrival at Mariner, and several which Mariner was able to heal before her
death, there is insufficient evidence to show Mariner’s conduct caused injury
to Battle.” 

          Dr.
Lipson testified that Mariner was negligent in caring for Battle and that this
negligence proximately caused Battle’s injuries and death.  Dr. Lipson
testified that Mariner’s negligence “caused her to develop painful, deep,
necrotic pressure ulcers, which became infected.  It caused her malnutrition
and dehydration, and placed her at risk of renal failure.”  Dr. Lipson then
identified specific standards of care that Mariner breached and explained how
these breaches injured Battle.

          Dr.
Lipson testified that Mariner was required to establish a complete and
comprehensive care plan for each of Battle’s admissions and that it breached
this standard of care because the care plan for Battle’s first admission was
not comprehensive and there was no care plan for Battle’s second admission in
Mariner’s records.  Dr. Lipson testified that a care plan was vital to ensure
that all caregivers understand facility policies and know how to treat the
patient.  He further testified that the first care plan was deficient because
it did not plan for hydration or aspiration control, address range-of-motion
issues, or assess and coordinate her care based on her existing and foreseeable
medical conditions.  

Dr. Lipson testified that Mariner breached the standard of
care for hydration because there was insufficient information in her medical
records pertaining to intake and output and because Battle was clinically
dehydrated (as shown by laboratory testing) for much of the time she resided at
Mariner.  He testified that dehydration, for example, could impact renal
function, dementia in a senior citizen, inhibit skin healing, and increase
likelihood of developing pressure ulcers.  Furthermore, inadequate hydration was
responsible for other medical conditions from which Battle suffered, such as diabetes
and bedsores.  Dr. Lipson testified that Mariner’s breach of the standard of
care for hydration injured Battle by contributing to her urinary tract
infection, her lethargy and confusion, and the development and worsening of her
pressure ulcers.  In addition, he testified that Mariner’s breach injured
Battle by putting her “at risk” for renal insufficiency and renal failure.  

          Dr.
Lipson testified that Mariner also breached the standard of care for nutrition.
 He said that Mariner knew Battle suffered from protein malnutrition when she
was admitted and that it had a duty to establish a diet plan to provide for
adequate protein and supplementation.  He testified that it failed to do so. 
In addition, during Battle’s second admission, Mariner failed to establish a
diet plan to address Battle’s diabetes.  Dr. Lipson opined that Mariner’s
breach of this standard of care injured Battle by contributing intermittently
to her confusion and lethargy and by exacerbating her pressure ulcers.

          Dr.
Lipson also testified that Mariner breached the standard of care regarding
aspiration.  He testified that Mariner’s records showed that Battle experienced
“frank aspiration.”  He testified that Mariner was required to assess Battle’s
ability to swallow, upon admission and periodically thereafter, establish a
diet for a patient experiencing dsyphagia, elevate the head of her bed, and
feed her in an upright position.  Dr. Lipson testified that nothing in the
records showed that Mariner took these steps.  He concluded, “[T]here was
inadequate assessment and care planning and actual hands-on care in the area of
dysphagia and aspiration prevention.”  Dr. Lipson testified that Mariner’s
breach of this standard of care caused Battle to experience frank aspiration
and aspiration bronchitis. 

          Dr.
Lipson testified that Mariner was required to have ongoing pain assessment and
to manage Battle’s pain with her lethargy and confusion.  He opined that
Mariner breached the standard of care for pain management on both admissions
because the records showed no ongoing pain assessment protocol and because
there were “times when [Battle] got adequate pain relief, but on the whole
there was no adequate pain control program for her and Mariner allowed her to
be in pain for portions of each day.”  For example, Dr. Lipson testified that
pressure ulcers are painful and a patient would be in pain every time she was
turned.  According to Mariner’s records, Battle sometimes received pain
medication before her dressings were changed, but at other times, she did not receive
medication.  Dr. Lipson testified that Mariner’s breach of this standard
of care injured Battle not only by allowing her to experience pain but also by
making her less likely to move and putting her at risk for exacerbation of her
pressure ulcers.  In addition, Dr. Lipson said that lack of pain
management increased the risk that Battle would not eat or drink and would
develop contracted extremities.  Other evidence was introduced that Battle did
not move for long periods of time, resisted being repositioned, and sometimes
refused to eat.

          Dr.
Lipson testified that Mariner breached the standard of care for preventing
pressure ulcers during both of Battle’s admissions.  He opined that “had she
been treated with standard care when she first arrived at Mariner, in all
reasonable medical probability her skin excoriations would have healed.”  He
stated that Mariner was required to assess Battle’s risk for skin breakdown and
development or pressure ulcers in light of her contributing medical factors,
like dehydration, malnutrition, and mobility.  He determined that Mariner
breached this standard of care because the medical records showed that Battle
spent long periods of time sitting in her wheelchair and because the records
did not indicate that Battle was regularly and consistently turned or
repositioned.  Dr. Lipson testified that Mariner’s breach of the standard of
care injured Battle by allowing her skin excoriations to “develop into two
stage IV necrotic-infected pressure ulcers before she left the facility for the
first time” and exacerbated her pressure ulcers during her second admission.  He
also testified that the records showed that Battle’s pressure ulcers were
intermittently infected, as evidenced by notations about “necrotic” ulcers,
foul odors, and blood-tinged discharge, which are signs of infection.  Finally,
he acknowledged that pressure sores can be clinically unavoidable, but he
testified that in Battle’s case they were avoidable and “their healing . . .
would have occurred had she gotten standard care.”

          Finally,
Dr. Lipson testified that Mariner breached the standard of care for infection
prevention.  He testified that Mariner was required to have an infection-control
program because Battle had an infection, Clostridium difficile (C. diff.), upon
admission to Mariner.  He testified that C. diff. can occur as a result of
antibiotic use but that it also can spread from person to person in
institutions as a result of poor hygiene.  He testified that Mariner breached
the standard of care by not having a documented control program for C. diff.
and by not taking proper precautions to ensure that fecal matter did not
contaminate her sacral pressure ulcer.  Dr. Lipson testified that Mariner’s
breach injured Battle by allowing her to have recurrent or continual
reinfection with C. diff. and by contaminating her open wounds, which could
“potentially produce a systemic infection.”

There was no evidence at trial that Battle suffered from
sepsis (a systemic bacterial infection), and both Dr. Nguyen, Battle’s treating
physician, and Dr. Garcia (Mariner’s expert) testified that Battle did not
suffer from sepsis.  

B.   Application of Standard of Review

Mariner contends that the evidence was legally and factually
insufficient to support the jury’s finding that Mariner was negligent and that
Mariner’s negligence proximately caused Battle’s injuries because Dr. Lipson
did not specifically identify any negligent Mariner employee, he was not
qualified to opine on the standard of care applicable to Mariner, and he did
not specifically testify how Mariner breached the standard of care but merely
testified about possibilities.  As discussed above, in the course of offering
his opinion Dr. Lipson was not required to identify any particular Mariner
employee in this suit against Mariner.  Mariner did not challenge Dr. Lipson’s
qualification as an expert at trial, and ample evidence was introduced
regarding his education, experience, and credentials regarding geriatrics and
nursing homes.  Finally, Dr. Lipson identified several specific standards of
care that he believed were breached by Mariner, and he explained how Mariner
breached the standards of care and how Mariner’s breach injured Battle. 
Viewing the evidence in the light most favorable to the verdict, we conclude
that Dr. Lipson’s testimony was legally sufficient to show that Mariner
breached a duty owed to Battle to act according to applicable standards of care
and that these breaches injured Battle.  See City of Keller, 168
S.W.3d at 827; Ocomen, 24 S.W.3d at 466.

As to factual sufficiency, we note that there is a conflict
in the evidence as to Mariner’s breach of the standard of care for infection
prevention.  Dr. Lipson testified that Mariner’s breach could have potentially
caused Battle to suffer from sepsis, but there was no evidence introduced at
trial that she actually did suffer from sepsis and both Dr. Nguyen and Dr.
Garcia, who testified for Mariner as a expert in geriatric medicine, said that
Battle did not suffer from sepsis.   Dr. Garcia also reviewed Battle’s medical
records, but Dr. Garcia concluded that Mariner did not breach the applicable
standards of care and that Battle’s injuries and death resulted from her
medical conditions that existed before she became a resident at Mariner.  Dr.
Garcia also testified that Battle’s smoking and lack of cooperation with staff
contributed to the exacerbation of her pressure ulcers.

Mariner makes no argument that the evidence of negligence and
proximate cause is factually insufficient because Dr. Lipson’s testimony was outweighed
by that of other expert witnesses.  Rather, Mariner argues only that Dr. Lipson’s testimony was insufficient.  See Ocomen,
24 S.W.3d at 466 (“In a medical malpractice case, breach of the standard of
care and proximate cause must be established through expert testimony.”).  Thus
we have addressed Mariner’s primary source of controverting testimony in only a
summary manner.

It is the province of the jury to resolve conflicting
evidence, to determine the credibility of the witnesses, and to weigh their
testimony.  See City of Keller, 168 S.W.3d at 819; Arias,
265 S.W.3d at 468.  Thus, having reviewed the record, we conclude that the
judgment was not so contrary to the overwhelming weight of the evidence as to
be clearly wrong and unjust.  See Ortiz, 917 S.W.2d at 772; Arias,
265 S.W.3d at 468.  We hold that the evidence was legally and factually
sufficient to support the jury’s verdict as to negligence and proximate cause.

III.        
Damages
and Evidence of Pain and Mental Anguish

          Mariner
also contends that the evidence was legally insufficient to support the jury’s
finding that Battle suffered pain and mental anguish compensable by $250,000.  In
its brief, Mariner argues first that there is no evidence or factually
insufficient evidence of pain and suffering and second that there is no
evidence or factually insufficient evidence of mental anguish.

A.   Broad Form Submission

When a party contends that there is no evidence to support
the submission of a specific element of damages in a broad-form jury question,
the party must object before the charge is read to the jury.  Harris County
v. Smith, 96 S.W.3d 230, 236 (Tex. 2002).  Here, the jury was asked to
award lump-sum damages for both pain and mental anguish.  Mariner argues on
appeal that there is no evidence to support an award either for pain and
suffering or for mental anguish, but Mariner did not object to the inclusion of
these elements of damages in a broad-form question before it was read to the
jury.  Thus, Mariner is limited to challenging the evidence to support the lump-sum
award for physical pain and mental anguish.  See Brookshire Bros., Inc. v.
Lewis, 997 S.W.2d 908, 922 (Tex. App.—Beaumont 1999, pet. denied) (“[T]o
successfully challenge a multi-element damage award on appeal, an appellant
must address all of the elements and show the evidence is insufficient to
support the entire damage award.”).

B.   Pain, suffering, and mental anguish

Conscious pain and suffering may be established by
circumstantial evidence. E.g., HCRA v. Johnston, 178 S.W.3d 861,
871 (Tex. App.—Fort Worth 2005, no pet.).  Matters of pain and suffering are
necessarily speculative, and it is within the province of the jury to set the
amount of such damages.  Hicks v. Ricardo, 834 S.W.2d 587, 591 (Tex.
App.—Houston [1st Dist.] 1992, no writ).  We give a jury’s determination of the
amount of damages a great deal of discretion.  Id. (citing Green v.
Meadows, 527 S.W.2d 496, 499 (Tex. Civ. App.—Houston [1st Dist.] 1975, writ
ref’d n.r.e.)).  “Once the existence of some pain and suffering has been
established . . . there is no objective way to measure the adequacy of the
amount awarded as compensation.”  Johnston, 178 S.W.3d at 871.  Put
another way, “[t]he process of awarding damages for amorphous, discretionary
injuries such as . . . pain and suffering is inherently difficult because the
alleged injury is a subjective, unliquidated, nonpecuniary loss.”  Id.

C.   Sufficiency of the Evidence

Mariner argues, “There is simply no evidence to support the
trial court’s award of $250,000 for pain and suffering for Battle.  No witness
testified that Battle in fact experienced any pain.”  But Robins testified that
Battle experienced pain:

Q.      What was your
understanding as to the primary reason why your mom was resistant to having the
nursing folks move her, especially in the beginning?

 

A.      She was in pain. 
And the way that they were moving her, she felt like they were hurting her.

 

Q.      Okay.  In other
words, it wasn’t—it wasn’t a personal issue?

 

A.      No.  It was a pain
issue.

 

Battle’s
treating physician testified that pressure ulcers are usually very painful,
though some patients experience more pain than others.  Dr. Lipson also
testified about “painful” pressure ulcers and noted that Battle only
sporadically received adequate pain relief.  While Dr. Garcia testified that
there was no evidence that Mariner failed to manage Battle’s pain adequately,
she did not testify that Battle did not experience pain while residing at Mariner.  

Viewing the evidence in the light most favorable to the
judgment, we conclude that reasonable and fair minded people could have
concluded that Battle suffered some pain as a result of the injuries sustained
while residing at Mariner. See City of Keller, 168 S.W.3d at 827;
Johnston, 178 S.W.3d at 871.  In addition, we conclude that the judgment
was not so contrary to the overwhelming weight of the evidence as to be clearly
wrong and unjust.  See Ortiz, 917 S.W.2d at 772; Arias, 265
S.W.3d at 468.  We hold that the evidence was legally and factually sufficient
to support the damages judgment.  We overrule Mariner’s third issue.

CHARGE ERROR

In its fourth issue, Mariner contends that the trial court
erred in submitting Question 7 of the trial court’s jury charge.  Questions 1
and 2 inquired about the cause of Battle’s death and invited the jury to
apportion responsibility between Battle and Mariner for her death.  Question 6
inquired about damages related to Battle’s death and was conditioned upon the
jury’s answers to questions 1 and 2.  Questions 3 and 4 asked about the cause
of Battle’s injuries and invited the jury to apportion responsibility between
Battle and Mariner for her injuries.  Question 7 depended on the jury’s answers
to questions 3 and 4 and asked, “What sum of money would have fairly and
reasonably compensated Betty Battle for pain and mental anguish?  ‘Pain and
mental anguish’ means the conscious physical pain and emotional pain, torment
and suffering experienced by Betty Battle before her death as a result of the
injury in question.”  Question
8 concerned punitive damages.

At the charge conference, Mariner objected to questions 1, 2,
3, and 8 on the basis that there was no evidence or legally insufficient
evidence to support the submission of those issues to the jury.  In addition,
Mariner requested an instruction relating to questions 1 and 3 and objected to
question 3 on the grounds that the plaintiffs were not entitled to recover
under both wrongful death and survival theories and were not entitled to
recover personal injury damages.  The trial court denied Mariner’s requested
instruction and overruled its objections.  Mariner did not object to question
7.

Mariner now argues that question 7 was improperly submitted
in broad form because it commingled damages for pain and mental anguish despite
an absence of evidence that Battle experienced mental anguish and because it
implied that Battle died as a result of the injuries she suffered while at
Mariner.

Objections to the charge must be presented to the trial court
“before the charge is read to the jury.”  Tex.
R. Civ. P. 272.  An objection not presented to the trial court during
this time is waived.  Id.; see also Crown Life Ins. Co. v. Casteel,
22 S.W.3d 378, 387, 389 (Tex. 2000) (requiring that jury-charge objection be
timely).  “A party objecting to a charge must point out distinctly the
objectionable matter and the grounds of the objection.”  Tex. R. Civ. P. 274; Castleberry v.
Branscum, 721 S.W.2d 270, 276 (Tex. 1986). 

Mariner argues that it preserved its appellate issue that
question 7 was improperly submitted in broad form by objecting to question 3 on
the grounds that the plaintiffs were not entitled to recover under both
wrongful death and survival theories and were not entitled to recover personal
injury damages.  We disagree.  An objection to one jury question that
plaintiffs are not entitled to recover under two separately pleaded and legally
cognizable theories applicable to a nursing-home negligence case is different
from an objection to a different jury question that  the type of damages recoverable
under two separately pleaded theories should not be submitted in broad form.  Mariner’s
objections to question 3 did not communicate to the trial court its complaint on
appeal about question 7.  See Tex.
R. Civ. P. 274; Castleberry, 721 S.W.2d at 276.  We hold that
Mariner did not preserve its jury-charge challenge, and we overrule Mariner’s
fourth issue.

CONCLUSION

          Having
considered and overruled each of Mariner’s issues, we affirm the judgment of
the trial court.

 

 

 

                                                                      Michael
Massengale

                                                                      Justice


 

Panel consists of
Justices Keyes, Sharp, and Massengale.